The State v. Fay C. Harris, Appellant.—81 S. W. (2d) 319.

Division Two, March 30, 1935.

*A. N. Abrams* for appellant.

738

*Roy McKittrick,* Attorney General, and *Wm. Orr Sawyers,* Assistant Attorney General, for respondent.

COOLEY, C.—Defendant was charged by informations filed at the same time in the Circuit Court of Jackson County with five separate offenses of robbery in the first degree, alleged to have been committed by means of a deadly weapon, a pistol. The cases were conducted in the circuit court substantially as one case. Defendant entered pleas of guilty to all the charges at the same time and immediately upon the filing of the informations and was on the same day sentenced to fifty years' imprisonment in the penitentiary on each charge. Thereafter, within four days, he filed in each case motions asking leave to withdraw his pleas of guilty and substitute pleas of not guilty, motions for new trial and motions in arrest of judgment, all of which were heard together by the court and overruled and defendant has appealed. The cases have been consolidated and briefed, argued and submitted together in this court.

The five offenses are charged to have been committed within a period of some six weeks, the first in point of time being charged to have been committed on August 14, 1933, and the last on September

29, 1933. The amounts charged to have been taken vary from $8.50 (in money, groceries and cigarettes) in one case to $19 in money in another, and aggregate in the five cases $66.80. On the hearing of defendant's motions it was shown that he was arrested on Friday, September 29, 1933, and taken to the police station where he was held until the following Monday morning, October 2, when he was taken to the prosecuting attorney's office. There he was questioned by Assistant Prosecuting Attorney Boyle who prepared the informations and subsequently handled the cases for the State. Defendant had been questioned at the police station where he admitted his guilt of at least one of the offenses, that of September 29, in which he had robbed Thomas H. Howle of $7.50 in money, $1 worth of cigarettes and rolls and coffee valued at thirty cents. At Mr. Boyle's office defendant confessed to all five of the robberies. Informations were prepared, defendant signed a written waiver of his right to preliminary examinations and to consult with friends or attorney, and was taken to the courtroom where the informations were all read to him and he was asked by Mr. Boyle if he desired to plead guilty to each, to which he replied in the affirmative and the pleas were entered accordingly. Mr. Boyle then stated to the court: "Now, Your Honor, in this case, before filing these five informations, I informed this defendant of his rights to a preliminary hearing before a Justice of the Peace and his rights to consult with friends and attorneys and to his trial before twelve men. I also informed him that he could waive that hearing and be filed on directly before this court here. I also informed him that if he waived his preliminary hearing and wanted to plead guilty before Your Honor that the penalty would be somewhere between ten years in the penitentiary and death and the exact amount would be in your discretion. He asked if I could give him any idea of the amount you would give him. I told him it would be entirely up to you. That is right, isn't it?

"THE DEFENDANT: Yes, sir.

"MR. BOYLE: Under these facts and circumstances he signed his waiver, waiving his preliminary hearing. Is that your signature?

"THE DEFENDANT: Yes, sir.

"MR. BOYLE: That is what you want to do now?.

"THE DEFENDANT: Yes, sir.

"MR. BOYLE: The facts are this man got out of the penitentiary in New Mexico and that May fourteenth this year he was paroled from a three to twenty-five year sentence for robbery in Santa Fe and served two years. He came to Kansas City where his sister lives, . . .

"THE DEFENDANT: (Interrupting): My folks live here also.

"MR. BOYLE: And he bought a gun. May I see the gun, Frank?

"FRANK HOWLAND: Yes, sir. (Hands gun to Mr. Boyle.)

"MR. BOYLE: He bought this gun in Kansas City for $15.00 and bought the cartridges.

"THE DEFENDANT: They gave me the cartridges.

"MR. BOYLE: Did you just have five?

"THE DEFENDANT: Six.

"MR. BOYLE: And he borrowed his sister's car and started out to hold up these places and it went on about a month's time, I guess.

"THE DEFENDANT: Yes, sir.

"MR. BOYLE: And on the twenty-ninth he held up this building wherein a grocery store is located at Thirty-third and Penn. They broadcast it over the radio and he left in his sister's car and drove out in the Northeast district and to Nineteenth and Paseo. Officers Howland and Johnson had received the radio call and description and when they arrested him, found this gun in his pocket and cartridges. He left the rolls and cake in the car, they found those in the car and a carton of Lucky cigarettes in the car, and the money that was stolen. He readily admitted his guilt. Mr. Howland identified him and that is about as much as I know about it."

At the request of the court Mr. Howle then described the "last holdup," that in which he was robbed. The defendant then stated in answer to questions by the court that he was thirty-three years old; that he had been receiving a pension because of disabilities resulting from his service in the war, and that the pension had been discontinued about July 1, 1933, leaving him and his wife and child destitute and that he had been unable to get work because of his physical condition; that he and another had "held up" a filling station in New Mexico when he was on his way to California seeking work, and had taken some gasoline; that they were caught "right there," and that on a plea of guilty he had been given an indeterminate sentence of from three to twenty-five years, from which, after serving about two years, he had been paroled. The court then said:

"The man was out on parole and given a chance. I want to double that sentence to what it was before. Fifty years in the State Penitentiary on each charge to run concurrently. I can't give you the same consideration as a man who never had a chance. The sentence will be fifty years on each charge to run concurrently."

Thereupon and all at the same time judgments of fifty years' imprisonment in each case were entered.

In his motion for leave to withdraw the pleas of guilty and enter pleas of not guilty and for new trial the defendant asserted in substance that he had pleaded guilty under misapprehension as to his rights and the results of such pleas induced by what the assistant prosecuting attorney had told him; that he had understood from what the assistant prosecuting attorney had told him that he would receive on pleas of guilty punishment aggregating only ten years' imprisonment and would not have entered such pleas had he not so understood and been led so to believe. His testimony at the hearing

of the motions tended to support his contentions. He had not consulted an attorney when he entered the pleas and did not then have counsel. At the hearing it appeared that his brother-in-law was present when the pleas were entered but defendant testified that he had not talked with him about the cases, though apparently he had had opportunity to do so. He testified that he had not talked with anyone except Mr. Boyle and the police officers. He further testified that upon his arrest he had been taken to the police station, kept there for seventy-two hours and then taken to Mr. Boyle's office where he was advised by the officers that the best thing he could do was to plead guilty and "get the leniency of the court," and that Mr. Boyle promised him he would only get ten years; that he told Mr. Boyle he would plead guilty but that he had been in jail three days, had not slept, was dirty and needed a shave, and "was in no condition to go into court and I asked him to wait;" that his request for time was denied and he was told that if he did not plead guilty at once "they would put the habitual criminal act against me;" that he was led to believe that if he pleaded guilty to the five charges he would receive sentences aggregating only ten years, and that if he did not he would be charged as a habitual criminal, and that he was also told that if he did not plead guilty his parole in New Mexico would be revoked and, "he said if I went back out there I would have an awful lot of time to do and he would see that I went back."

Mr. Boyle and Frank Howland, a member of the police force who had arrested defendant, brought him to Mr. Boyle's office and was present while Mr. Boyle talked to him prior to filing the informations, denied that defendant had been told he would receive only ten years' imprisonment on pleas of guilty. Mr. Howland said that Mr. Boyle told defendant that his sentence "could run from ten years to life. It was up to the court as to what he would receive;" that Mr. Boyle did not ask defendant to plead guilty. He said that defendant asked that he be given until the next morning before entering his pleas but that he then said: "Oh, I might as well get it over with now. I want to get it over right now;" that if the pleas had not been entered at that time he intended to take defendant to the warrant desk and "have him filed on;" that it was "up to the prosecuting attorney's office" whether or not he would be charged under the Habitual Criminal Act.

Mr. Boyle testified that defendant admitted to him that he had committed five holdups and said he wanted to plead guilty; that he informed defendant of his right to a preliminary hearing and to consult friends or attorneys, which rights he could waive, and that defendant did agree to waive such rights and voluntarily signed the written waiver offered in evidence. He testified that he informed defendant that the punishment might be "from ten years to death," and that he could not give him any idea as to what punishment the court would assess.

742

On cross-examination he was asked whether the defendant had not asked him to wait until the next day so that he could get some rest, to which he replied: "I do not recall it. I wouldn't say he did say that or I wouldn't say that he didn't say it. I wouldn't say one way or the other on that because I do not just recall it." This followed:

"Q. And when he was brought to your office did you refer to his unexpired term in the New Mexico penitentiary? A. No, I didn't refer to that but he was asking Officer Howland about the habitual. I probably did tell him that he was—that if he was filed on, he would be filed on under the Habitual Criminal Act. That is our general rule.

"Q. But if he plead guilty you wouldn't file on him? That is your inducement? A. You can call it what you want. I told him if he pleaded guilty I would file the robbery charges against me (him?) or if not, I would take him to the warrant desk where they always file the habitual."

It is clearly apparent from the statement which we have quoted above made by the trial court at the time of assessing the punishments on defendant's pleas of guilty that the court meant to make the sentences run concurrently and intended that for the five offenses the defendant should be adjudged to undergo a total of fifty years' imprisonment. That intention also clearly appears from other facts shown by the bill of exceptions which we have not set out. But the judgments actually entered do not effectuate that intention.

There have been filed here in each case a separate transcript of the record proper, certified as correct by the clerk of the circuit court. We have also before us a separate document, certified by the circuit clerk to be a correct copy of the *bill of exceptions* in each case. (Only one copy has been filed here but it is conceded that identical bills were filed in each case.) In the bill of exceptions what purports to be a copy of the judgment in each case is set out. The cases were numbered respectively in the circuit court C-15422, C-15423, C-15424, C-15425 and C-15426. According to the purported copies of the judgments as set out in the bill of exceptions there is appended to and appearing as part of the judgment in each of the cases C-15423, C-15424, C-15425 and C-15426 an order of the court that the sentence shall run concurrently with that in case C-15422. In the cases following C-15423 the order also refers to and directs that the sentence run concurrently with that in the other prior numbered cases. But in the transcripts of the records proper no such order appears. According to those transcripts there was a sentence and judgment of fifty years' imprisonment in each case with no reference to any of the other cases and no order that the sentences run concurrently.

The judgment is a part of the record proper. It does not properly belong in a bill of exceptions. Where, as here, there is

conflict between a certified transcript of the record proper and a certified copy of the bill of exceptions (in this instance in separate documents) it would seem that as to matters constituting parts of the record proper and not properly belonging in the bill of exceptions, the transcript of the record proper should govern. According to such transcripts the situation presented falls within the express provisions of Section 4456, Revised Statutes 1929 (Mo. Stat. Ann., p. 3061), which reads:

"When any person shall be convicted of two or more offenses, before sentence shall have been pronounced upon him for either offense, the imprisonment to which he shall be sentenced upon the second or other subsequent conviction shall commence at the termination of the term of imprisonment to which he shall be adjudged upon prior conviction."

The record certified here as a whole shows conclusively and it is conceded that defendant pleaded guilty to all five informations at the same time and before he was sentenced on either plea. The result is that under the statute, if we treat the judgments as being correctly shown by the transcripts of the record proper, the sentences are cumulative, i. e., they run successively, not concurrently, and the defendant has been sentenced to two hundred and fifty years' imprisonment. If, on the other hand, we were to disregard the transcripts of the record proper and treat the bill of exceptions as correctly setting out the judgments, we think the same result follows, this because the statute appears to be mandatory in its terms, leaving to the court in situations falling within the express terms of the statute no authority to make the imprisonment to which defendant is sentenced on a second or other subsequent conviction commence before the termination of the imprisonment to which he is adjudged upon the prior conviction; in other words, it leaves the court no authority in such situation to make the sentences run concurrently. Such is the contention of the State and we believe it is the only possible construction of the statute without adding to it under the guise of construction further provisions or exceptions not contained in its language nor clearly appearing to have been within the intendment of the Legislature. This statute is discussed in State ex rel. Meininger v. Breuer, 304 Mo. 381, 264 S. W. 1, where, after pointing out that it had evidently been taken from a New York statute, enacted at a time when it was generally held that courts had power to impose cumulative sentences but that in order to do so it was necessary for the subsequent sentence to contain a specific direction to that effect, the court said, 304 Mo. l. c. 404, 264 S. W. l. c. 7:

"Courts sometimes inadvertently omitted the direction and at other times did not make it sufficiently certain to be effective. This statute was devised to put an end to miscarriages of the kind in so far as

744

situations described in the statute are concerned. The purpose of the statute was merely to provide that in the cases it covered the sentences should run successively *by force of the statute itself* and not be dependent for their cumulative character upon any action of the trial court specifically referable to that matter."

After discussing the origin and purpose of the New York statute from which ours was taken the court further said, 304 Mo. l. c. 405, 264 S. W. l. c. 7:

"The statute did not purport to give the courts any power to impose cumulative sentences. It took from them the power, in certain cases, to impose any sentence *other than* a cumulative one. It did this by writing itself into every sentence, in the kind of cases it described, as a part of such sentence." [See, also, Ex parte Durbin, 102 Mo. 100, 14 S. W. 821; Ex parte Turner, 45 Mo. 331.]

■ In the instant case the court evidently overlooked or misconstrued Section 4456, supra, resulting that the defendant received sentences aggregating two hundred and fifty years when the court intended to assess fifty years' imprisonment, itself a severe punishment. For this reason it seems clear to us that these judgments should not be permitted to stand.

It is suggested by the learned Assistant Attorney General representing the State that under Section 3765, Revised Statutes 1929 (Mo. Stat Ann., p. 3304), providing that where a judgment in a criminal case is "erroneous as to time or place of imprisonment," it shall not be reversed for that cause but that the appellate court shall sentence the convicted person "to the proper place of confinement, and for the correct length of time," this court may and should sentence the defendant for the time the trial court indicated it meant to make the aggregate sentences run. Without considering whether or not that statute could be applied in the situation here presented, we think it should not be applied under the circumstances even if it could be were there no facts to consider save the court's misapprehension of said Section 4456. Nor have we overlooked State v. McFadden, 309 Mo. 112, 274 S. W. 354, wherein the trial court, through misapprehension as to the applicable statute, sentenced the defendant to thirty years' imprisonment when the maximum penalty was five years, and this court reversed and remanded the cause, and directed the trial court, in its discretion, either to enter judgment according to the statute or to permit the defendant to withdraw his plea of guilty and plead not guilty.

We have summarized the facts developed at the hearing of defendant's motions. At that hearing the occurrences in the courtroom not shown by the record proper, at the time the pleas of guilty were entered, as well as what had occurred previously in Mr. Boyle's office, were developed by evidence preserved in the bill of exceptions. The evidence justifies the finding that Mr. Boyle did not

intentionally mislead the defendant as to his rights, and did not promise him that he would receive no more than ten years' imprisonment. But it is evident that Mr. Boyle either overlooked or misconstrued Section 4456, as did the court. And while he did not tell the defendant that the total imprisonment on the five pleas of guilty, entered at one time, would not exceed ten years, he did tell him that it could be that low, which, as we have seen, was a misapprehension of the law. The minimum punishment for robbery in the first degree, committed by means of a deadly weapon, is ten years' imprisonment. Therefore, since upon pleas entered and sentences pronounced as in this case, the sentences could not run concurrently, defendant could not have been given a minimum of ten years if he entered the pleas all at one time and before any sentence was pronounced. Of this defendant was ignorant and it was not explained to him, but on the contrary he was told in effect that the total punishment on the five pleas could be as low as ten years' imprisonment. In addition, we think it clear from the evidence that defendant was given to understand that if he did not plead guilty at once to the five informations he would be charged as a habitual criminal, having thus to face the certainty of life imprisonment if so convicted (Sec. 4461, R. S. 1929, Mo. Stat. Ann., p. 3063), and also that he understood that unless he so pleaded his New Mexico parole would probably be revoked. From the misinformation given him as to the possible minimum punishment he had grounds to hope, and no doubt expected, less severe punishment if he pleaded guilty than if the threatened habitual criminal charge should be filed against him. It is not difficult to comprehend how his hopes and fears, so aroused, operated under the circumstances in which he was placed to induce him to enter the pleas as he did.

We shall not take space to review the authorities on this question since the judgments pronounced cannot in any event be permitted to stand. The principle involved has been stated and elucidated in prior decisions. [See State v. Stephens, 71 Mo. 535; State v. Dale, 282 Mo. 663, 222 S. W. 763; State v. Cochran, 332 Mo. 742, 60 S. W. (2d) 1, 2 (5-8) ; State v. Hare, 331 Mo. 707, 56 S. W. (2d) 141; State v. Kellar, 332 Mo. 62, 55 S. W. (2d) 969.] In view of all the facts and circumstances we think the ends of justice will best be subserved by permitting defendant to withdraw his pleas of guilty. The judgments in all five cases are reversed and the cases are remanded to the circuit court with directions that in each case the court set aside the judgment heretofore entered therein and its order overruling defendant's motion to withdraw his plea of guilty and that defendant be permitted to withdraw his plea of guilty. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.